IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

MONTY D. LETSON,
      Plaintiff,

vs.                               Case No. 3:07cv416/MCR/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

       This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act (Act) and related statutes, 42 U.S.C. § 401, *et seq.*  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for disability insurance benefits (DIB) under Title II of the Act, 42 U.S.C. §§ 401–34, and for Supplemental Security Income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

       Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.      PROCEDURAL HISTORY

        This suit involves two applications for benefits made by Plaintiff, one for DIB and one for
SSI, both of which were filed on June 9, 2000 (*see* Tr. 29).[1]  In each application, Plaintiff alleged
a disability onset date of April 1, 2000 (Tr. 31).  The applications were denied at the initial level of
determination on February 5, 2001 (Tr. 29).  Thereafter, at Plaintiff's request, an administrative
hearing was held (*id.*).  On August 27, 2002, following the hearing, an administrative law judge
(ALJ) rendered a decision in which he found that Plaintiff was not under a "disability" as defined
in the Act (Tr. 58–67).  On March 15, 2004, the Appeals Council of the Social Security
Administration granted Plaintiff's request for review and remanded the case for a second
administrative hearing (Tr. 79–81).  On August 17, 2006, after the second hearing, an ALJ issued
a decision again finding that Plaintiff was not disabled as defined in the Act (Tr. 29–51).  On August
31, 2007, the Appeals Council denied Plaintiff's request for review (Tr. 12–14).  Thus, the August
17, 2006 decision of the ALJ (Tr. 29–51), issued following Plaintiff's second hearing, stands as the
final decision of the Commissioner, subject to review in this court.  Falge v. Apfel, 150 F.3d 1320
(11th Cir. 1998).  This appeal followed.

II.     FINDINGS OF THE ALJ

        On August 17, 2006, the ALJ made several findings relative to the issues raised in this appeal
(Tr. 29–51):

        1)      Plaintiff is insured for Title II purposes through September 30, 2002.

        2)      Plaintiff has not engaged in substantial gainful activity (SGA) since April 1, 2000,
                the date he alleges he became disabled.

        3)      Plaintiff has the following "severe" impairments:  status post infectious endocarditis,
                status post aortic valve replacement in November 1998 and May 2000, borderline
                intellectual functioning, seizure disorder with partial onset, major depressive disorder
                without psychotic features, and generalized anxiety disorder.  Plaintiff, however,
                does not have an impairment, or combination of impairments, which meets or equals
                the criteria of an impairment listed in Appendix 1, Subpart P, 20 C.F.R. Part 404.

---

[1]All references to "Tr." refer to the 719-page transcript of the administrative record, filed by Defendant on
February 4, 2008 (*see* Docs. 7, 8).

4)      Plaintiff retains the residual functional capacity (RFC) to perform the full range of unskilled work at the light exertional level.

5)      Plaintiff is unable to perform his past relevant work, but there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

6)      Plaintiff, therefore, has not been under a "disability," as defined in the Act, from April 1, 2000, through August 17, 2006, the date of the ALJ's decision.

(Tr. 29–51).

## III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance, it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g),[2] the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing SGA, he is not disabled.

2.      If the claimant is not performing SGA, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen,

---

[2]In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI.  However, separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416).  Therefore, citations in this report and recommendation should be considered to refer to the appropriate parallel provision.  The same applies to citations of statutes or regulations found in quoted court decisions.

786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.   PLAINTIFF'S BACKGROUND INFORMATION, INCLUDING HIS PERSONAL, EMPLOYMENT, AND MEDICAL HISTORY

A.   Personal History

Plaintiff was born on May 22, 1960, and at the time of his alleged onset of disability he was thirty-nine (39) years old (Tr. 32).  Plaintiff has the equivalent of a high school level of education and past relevant work as a gutter installer (*id.*).  Plaintiff has alleged disability due to a combination of mental and physical impairments, including depression, anxiety, hepatitis C, seizures, and a history of congestive heart failure (with two post aortic valve replacements) (*id.*).  Plaintiff claims that since his most recent heart surgery, in 2002, he has been weak and tired and has experienced significant difficulties with memory and concentration (*id.*).  He further alleges that he suffers from chest pain and pressure approximately ten to twelve times a month, has seizures four to five times a year, has panic attacks approximately ten times per month, and continues to experience rectal pain following a rectal surgery several years ago (*id.*).  As a result of Plaintiffs' impairments, he has both physical and mental limitations, and he suffers from side effects of his medications, such as stomach and bowel problems, sleepiness, and lethargy (*id.*).  Finally, Plaintiff has a history of IV drug use and has been on methadone maintenance for approximately (16) sixteen years (*id.*).

B.   Relevant Medical History

Plaintiff's medical history has been summarized quite thoroughly by the ALJ (*see* Tr. 33–38) and need not be repeated in its entirety here.  Where relevant, Plaintiff's medical records will be discussed in the discussion that follows.

V.   DISCUSSION

Plaintiff raises several issues in the instant appeal.  First, Plaintiff contends that the ALJ erred in failing to assign proper weight to the opinions of Dr. Dohn and possibly Dr. Cibulski, a treating psychiatrist and physician, respectively (Doc. 10 at 14–17).  Similarly, Plaintiff contends that the ALJ improperly discounted the opinions of "numerous medical providers," including Drs. Rogers, Herlihy, and Cooper (*id.* at 17–19).  Lastly, Plaintiff asserts that the ALJ improperly

"rejected the physical limitation opinions of Dr. Bader," a one-time consultative examiner (*id.* at 19–20; *see also* Tr. 364–72).

A.      Treating Physicians — Dr. Dohn and Dr. Cibulski

Henry H. Dohn, M.D., a psychiatrist, treated Plaintiff from approximately December 2003 through March 2006 (*see* Tr. 4; *see also* Tr. 300–17, 321, 354–59, 373–73A).  When Plaintiff first presented for treatment, on December 9, 2003, Plaintiff advised Dr. Dohn that he was "running low and running out of Paxil the past couple of weeks and has felt bad" (*see* Tr. 307).[3]  Dr. Dohn noted Plaintiff's reported symptoms, including sad mood, mood swings, increased appetite and weight gain, trouble sleeping, anergia, few interests, crying spells, anxiety, panic attacks, low self-esteem, social withdrawal, inability to settle down and relax, racing thoughts, confusion, fearfulness, decreased memory and attention, and prior history of suicidal ideas (Tr. 308).

After his initial evaluation, Plaintiff was assessed by Dr. Dohn as follows:

| | |
|---|---|
| AXIS I | 1.  Depression secondary to general medical condition with major depressive disorder, recurrent type and bipolar disorder-like features, chronic, poorly controlled at present<br>2.  Probable attention-deficit/hyperactivity disorder, combined type as a baseline |
| AXIS II | Obesessive-compulsive personality traits |
| AXIS III | 1.  Hepatitis C<br>2.  Hypertension |
| AXIS IV | Psychosocial stressors: Severe |
| AXIS V | Current Global Assessment of Functioning: 50[4]<br>Highest GAF in past year (estimated): 75[5] |

(Tr. 308) (footnotes added).

---

[3]It was also noted at the initial visit with Dr. Dohn that Plaintiff's "Social Security Disability claim" was pending (Tr. 307).

[4]Global assessment of functioning (GAF) is the overall level at which an individual functions including social, occupational, academic, and other areas of personal performance.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994).  It may be expressed as a numerical score.  *Id.* at 32.  A score between 41 and 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  *Id.*

[5]A score between 71 and 80 reflects that if symptoms are present, they are transient and expectable reactions to psychosocial stresses, with no more than slight impairment in social, occupational, or school functioning.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994).

After Plaintiff's initial evaluation, as noted by the ALJ, Plaintiff began seeing Dr. Dohn (approximately) every two to three months, during which Plaintiff was counseled by Dr. Dohn and his medications were managed (Tr. 37).[6]

Pertinent to the issues raised in this appeal, Dr. Dohn filled out a "Supplemental Questionnaire as to Residual Functional Capacity" on April 13, 2004 (Tr. 301–02).   On the questionnaire, Dr. Dohn opined that Plaintiff has "moderate" restrictions in:  (1) activities of daily living; (2) understanding, carrying out, and remembering instructions in a work setting; and (3) performing simple tasks in a work setting (*id.*).  Dr. Dohn further opined that Plaintiff has "marked" restrictions in: (1) maintaining social functioning, (2) responding appropriately to supervision in a work setting, (3) responding appropriately to co-workers in a work setting, and (4) performing repetitive tasks in a work setting (*id.*).  Dr. Dohn additionally opined that Plaintiff has "constant" deficiencies in concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner (in a work setting or elsewhere) (Tr. 301).  Finally, Dr. Dohn opined that Plaintiff has "extreme" episodes of deterioration or decompensation in work or work-like settings which cause him to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors) (*id.*).

The ALJ declined to "assign any significant evidentiary weight" to the foregoing opinions of Dr. Dohn (Tr. 42), and Plaintiff contends that the ALJ erred in this regard (Doc. 10 at 14–17).

As this court is well aware, substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* Lewis v. Callahan, 125 F.3d 1436, 1439–41 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991);  Sabo v. Comm'r. of Social Security,  955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's

---

[6]The court notes that the remainder of Dr. Dohn's records are handwritten and difficult to read (*see* Tr. 354–59, 373–73A), but they appear to document improvement in Plaintiff's condition.  For example, in December 2004, the notes reflect a report by Plaintiff that "I've been OK," as well as Dr. Dohn's opinion that Plaintiff's mood was stable and he "looks/sounds overall better than before" (Tr. 355).  Similarly, in December 2005, Plaintiff again reported "doing OK," and Dr. Dohn noted that Plaintiff's mood was "stable" and "good" (Tr. 373A), and in March 2006, Dr. Dohn again reported that Plaintiff's mood is "OK/good" and "stable" and that Plaintiff looks and sounds "good" (Tr. 373).

opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See* Edwards, 937 F.2d at 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See* Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also* Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d). Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion.  *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether Plaintiff meets a listed impairment, a claimant's RFC (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors, because those ultimate determinations are the providence of the Commissioner. 20 C.F.R. § 404.1527(e).  The opinion by a treating physician that a patient is "unable to work" or is "disabled" is not dispositive for purposes of Social Security claims.  The Commissioner's regulations and the interpretations of those regulations clearly provide that an ALJ should give weight to a physician's opinions concerning the nature and severity of a claimant's impairments, but that the ultimate question of whether there is disability or inability to work is reserved to the

Commissioner.  For instance, 20 C.F.R. § 404.1527(e)(1) specifically states that a finding of disability or inability to work by a medical source does not mean that the Commissioner will automatically reach the same conclusion.  Furthermore, the Commissioner "will not give any special significance to the source" of an opinion on issues reserved for the Commissioner.  20 C.F.R. § 404.1527(e)(3); *see also* Social Security Ruling 96-5p (whether an individual is disabled is a question reserved to the Commissioner; treating source opinions on such questions are "never entitled to controlling weight or special significance").  Although such opinions on disability are not entitled to controlling weight, they must not be ignored, and the Commissioner must examine the entire record to determine whether such opinions are supported by the record.  SSR 96-5p.  In Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997), the court reversed the ALJ's finding of no disability, in part because the ALJ relied on a treating physician's report that the claimant could no longer work as a longshoreman when this report was ambiguous as to whether the claimant could do any work, and the physician subsequently wrote a letter saying the claimant was completely disabled.  To require the Commissioner to accept as controlling a statement that a patient is or is not disabled would require the Commissioner to credit the physician not only with knowledge of the patient's physical condition, but also with an understanding of the nuances of how the regulations analyze physical limitations with respect to job experience, age, education, transferability of skills, the definitions of the various levels of exertion relevant to types of work, and similar matters.  Additionally, a physician's opinion on whether a person is able to work may be colored by such things as the physician's knowledge of local hiring practices, whether there are specific job vacancies, a person's reluctance to do a particular kind of work, and similar matters.  These things are not properly considered by the Commissioner in determining disability.  20 C.F.R. § 404.1566.  For all these reasons, a physician's opinion that his or her patient cannot work or is disabled is not a conclusive medical opinion for the purpose of Social Security benefits determinations and by itself is not entitled to special significance.

Finally, the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.  *See* Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)).  "The ALJ is free to reject the opinion of any physician when the evidence supports a

contrary conclusion." Oldham v. Schweiker, 660 F.2d 1078, 1084 (Former 5th Cir. Unit B Nov. 1981).

Here, in rejecting the opinions of Dr. Dohn as contained on the April 13, 2004 questionnaire,[7] the ALJ first discussed the initial evaluation of Plaintiff by Dr. Dohn in December 2003 and noted the vast disparity between the GAF assessments assigned at that time (i.e., 50 "currently" but as high as 75 in the year preceding the evaluation) (Tr. 42–43). As discussed *supra*, the lower score suggests serious symptoms, but the higher score reflects only transient symptoms and no more than slight functional impairment. The ALJ noted that Dr. Dohn offered no explanation for Plaintiff's rapid deterioration over the course of one year, as suggested by the GAF scores he assessed (*see id.*). Moreover, Dr. Dohn's notes reflect that when Plaintiff first saw him in December 2003, he was running out of or was low on Paxil (Tr. 307).[8] Thus, to the extent Paxil controlled Plaintiff's condition, or similarly, that Plaintiff's condition deteriorated when he ran out of or low on Paxil, this is inconsistent with disability. *See, e.g.*, Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) ("A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling") (citation omitted). Similarly, as Plaintiff had received no psychiatric treatment prior to his evaluation by Dr. Dohn,[9] the "current" GAF of 50 reflected Plaintiff's level of functioning when he was receiving no treatment.

In further discounting Dr. Dohn's opinions, the ALJ noted that the opinions on the April 2004 questionnaire are inconsistent with the opinions Dr. Dohn rendered in December 2003 (Tr. 42). For example, Dr. Dohn noted marked and extreme functional limitations in April 2004, which are

---

[7]These opinions were rendered after Plaintiff was seen by Dr. Dohn on two to three occasions, December 9, 2003 (Tr. 307), February 12, 2004 (Tr. 305), and possibly on April 13, 2004, the same day Dr. Dohn rendered the opinions at issue (*see* Tr. 303).

[8]The Paxil was being prescribed by another physician (*see* Tr. 307, 557).

[9]Although Plaintiff told Dr. Dohn in November 2003 that he had previously seen a psychiatrist (Dr. McGuire, in Birmingham, Alabama) (*see* Tr. 307), the file contains records from Dr. McGuire that contradict Plaintiff's statement. For example, the record reflects that Dr. McGuire is a medical doctor, not a psychiatrist, and further, that Plaintiff specifically told Dr. McGuire in February 2001 that he was "not seeing a psychiatrist, but [] he would be willing to see a psychiatrist" (Tr. 557). Thus, despite alleging disability since April 2000, Plaintiff sought no true psychiatric treatment until December 2003 (as noted by the ALJ ), which was after he filed a claim for disability benefits (*see* Tr. 37, 41, 307).

inconsistent with a GAF as high as 75 in the year immediately preceding Dr. Dohn's December 2003 evaluation.

Additionally, the ALJ noted that Dr. Dohn's "initial assessment report does not indicate that [Plaintiff] disclosed that he was being prescribed Xanax, as well as Paxil, by Dr. Cibulski simultaneous to Dr. Dohn's prescription of those medications" (Tr. 43). *See* Moore v. Barnhart, 405 F.3d 1208, 1213 (11th Cir. 2005) (drug-seeking behavior is a proper factor for the ALJ to consider in making an RFC determination). Similarly, the ALJ noted that the report fails to reflect that Dr. Dohn knew about Plaintiff's history of IV drug abuse and methadone maintenance treatment (Tr. 43). Indeed, Plaintiff admitted during his testimony that he failed to reveal his methadone use to Dr. Dohn (Tr. 706–07). Plaintiff's methadone use, as well as Plaintiff's history of drug abuse and simultaneous prescriptions of the same medication, are relevant and necessary to an accurate diagnosis and treatment, as well as the formation of well-founded opinions by a treating physician, and Plaintiff should have informed Dr. Dohn of these matters. Stated another way, it appears that Plaintiff was less than forthright with Dr. Dohn about medically relevant information, which calls into question Dr. Dohn's reliance on Plaintiff's self-reported symptoms and is good cause to discredit the opinions Dr. Dohn formed as a result.

Thus, because the ALJ articulated the inconsistencies and reasons on which he relied in discrediting Dr. Dohn's April 2004 opinions — opinions that were rendered on one occasion early in the treating relationship between Plaintiff and Dr. Dohn — and because the ALJ's reasons are supported by substantial evidence on the record as a whole, the ALJ's finding should not be disturbed.

While Plaintiff does not directly assert that the ALJ erred in discounting the opinions of Dr. Cibulski (*see* Doc. 10 at 6–7, 14–17), Plaintiff generally states that in order to find Plaintiff disabled, "the ALJ had to reject the disability opinion[]" of Dr. Cibulski, a treating physician (*id.* at 14). Plaintiff appears to suggest that Dr. Cibulski's opinions regarding his mental limitations (i.e., that Plaintiff is "extremely" limited in all areas of mental functioning (*see* Tr. 257–58)) compel a finding of disability, but Plaintiff offers no support for this argument (*see* Doc. 10 at 6–7, 14–17). The court notes, however, that Dr. Cibulski is a medical doctor, who was Plaintiff's primary care and/or internal medicine physician, and he prescribed antidepressant medications to Plaintiff (*see* Tr.

35–36, 41). Thus, as the ALJ noted, psychology is outside Dr. Cibulski's area of expertise (*see* Tr. 41). Moreover, and perhaps more important, the form on which Dr. Cibulski's opinions appear, titled Supplemental Questionnaire as to Residual functional Capacity, appears to have been altered (*see* Tr. 41, 257–58). For example, as noted by the ALJ, the word "moderate," <u>and</u> the word "extreme," appears to have been circled on the form in all but one area where Dr. Cibulski was asked to describe Plaintiff's mental abilities (*id.*). Thus, the form is internally inconsistent, or as the ALJ opined, altered, and therefore the opinions thereon are unworthy of any weight (*id.*). Furthermore, it appears to the undersigned that some handwritten notations were on the original questionnaire near the word "moderate," but the notations are now illegible (*see* Tr. 258, Questions 5(D) and 5(E)). Thus, to the extent Plaintiff has raised an issue with regard to Dr. Cibulski, Plaintiff is not entitled to relief, as the ALJ properly refused to consider the opinions on the questionnaire.

      B.      Consultative Examiners — Doctor Rogers, Doctor Herlihy, and Doctor Cooper

      Plaintiff next contends that the ALJ improperly discounted the opinions of Drs. Rogers, Herlihy, and Cooper (Doc. 10 at 17–19).

      1.      Doctor Rogers

      Jon G. Rogers, Ph.D., evaluated Plaintiff on one occasion, March 21, 2002 (Tr. 206). In pertinent part, his records reflect that Plaintiff was administered several psychological assessment tests, including the WAIS-III (resulting in a full scale I.Q. of 87 (low average)), WIAT (Plaintiff was determined to read at the 7th grade level, spell at the 5th grade level, and perform numerical operations at the "3.6th" grade level), BDI-II (Plaintiff scored 39, which indicates "severe depression"), and the WMS-I (3d ed.) (resulting in a memory quotient of 80, which was noted to be "slightly below [Plaintiff's full scale] I.Q.") (Tr. 206, 209–10). Due to the number of psychiatric symptoms reported by Plaintiff, the SCL-90-R was also administered, after which Dr. Rogers stated, "[s]even of the nine scales were significantly elevated, consistent with a psychiatric diagnosis" (Tr. 210). Plaintiff was assessed with Depressive Disorder, NOS; Reading, Learning, and Mathematics Disorders; Anxiety Disorder, NOS; and Opioid Dependence, and he was assessed with a GAF of 50 (Tr. 206). Additionally, Dr. Rogers completed a "Supplemental Questionnaire as to Residual Functional Capacity" (Tr. 211). Dr. Rogers opined that Plaintiff had functional limitations ranging

from moderate (in five areas) to marked (in four areas), with no "mild" or "extreme" limitations (Tr. 211–12).

### 2.    Doctor Herlihy

Plaintiff was also examined in March 2002, by Charles E. Herlihy, M.D., F.AP.A., an adult and forensic psychiatric consultant (Tr. 213).  Plaintiff advised Dr. Herlihy that his "emotions don't keep [him] from working"; rather, it is his physical condition that prevents him from working (*id.*). Dr. Herlihy reported:

> I did not do much in the way of evaluating [Plaintiff's] intellectual status, because it was my plan to ask for psychological testing, which has been done, and an excellent report has been [prepared by Dr.] Rogers, Ph.D.  I have used some of this report in doing my own psychiatric report.

(Tr. 214).  Dr. Herlihy then concluded that Plaintiff "cannot hold any gainful employment because of his depression and because of serious physical problems" (*id.*).  Additionally, Dr. Herlihy completed a questionnaire regarding Plaintiff's mental RFC (Tr. 215–216).  His responses were similar to those of Dr. Rogers, in that Plaintiff was assessed with marked and moderate mental limitations, and no mild or extreme limitations were noted (*see id.*).

### 3.    Doctor Cooper

On September 27, 2004, A. Mitch Cooper, Ph.D., evaluated Plaintiff at the request of the Division of Disability Determinations (DDS) (*see* Tr. 322).  The WAIS-III was administered to Plaintiff and this time resulted in a full scale I.Q. of 72 (borderline intellectual functioning) (Tr. 325–26), which is obviously lower than the test administered in 2002 by Dr. Rogers.  Dr. Cooper opined that Plaintiff's impaired concentration and pain likely contributed to the lower I.Q. score (Tr. 325).  Plaintiff was assessed with Major Depressive Disorder, Recurrent, Severe, without psychotic features; Generalized Anxiety Disorder; Opioid Dependence; and Learning Disorders (Tr. 326). Additionally, Dr. Cooper opined that Plaintiff's prognosis was "poor," noting Plaintiff's "long history of mental health problems centering around depression and anxiety," and noting that Plaintiff was "unlikely to show any substantial improvement" beyond his current level of functioning (Tr. 326).  Finally, Dr. Cooper completed a "Medical Assessment of Ability to do Work-Related Activities (Mental)" (Tr. 328–29).  On the assessment, Dr. Cooper generally estimated that Plaintiff's abilities were either "poor" (i.e., seriously limited) or "fair" (i.e., limited but satisfactory)

(*id.*).  In support of his opinions regarding Plaintiff's mental limitations, Dr. Cooper stated as follows: "chronic depression, high anxiety level, impaired coping skills, poor concentration, borderline intellect[ual functioning] plus learning disorders (by history), [and] social withdrawal" (*id.*).

After considering the opinions of Dr. Rogers, Dr. Herlihy, and Dr. Cooper, the ALJ stated that "no determinative evidentiary weight can be assigned" to their conclusions "with respect to [Plaintiff's] degree of mental functional limitation" (Tr. 41).  Plaintiff contends that the ALJ erred in discounting and rejecting their opinions (Doc. 10 at 18).

The Regulations provide that every medical opinion should be evaluated by the ALJ, and unless a treating source's opinion is given controlling weight, the following factors are considered in deciding the weight to be given to any medical opinion: examining versus non-examining (the opinions of examiners are given more weight than a non-examining source); treatment relationship, including length of the treatment relationship, frequency of examination, and nature and extent of the treatment relationship; supportability of the opinion(s); consistency with the record as a whole; specialization; and "other factors."  *See* 20 C.F.R. § 404.1527.  However, as noted *supra*, the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.  *See* Johnson, 240 F.3d at 1148 (citation omitted).  Moreover, "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."  Oldham, 660 F.2d at 1084.

Here, in deciding to assign no determinative weight to the opinions at issue, the ALJ first noted:

> The primary bases for discounting the opinions of Dr. Rogers, Dr. Herlihy, and Dr. Cooper, as set forth in the mental residual functional capacity questionnaires and medical assessment forms they completed at the times of their respective evaluations of [Plaintiff], include the fact that all of these examiners based their opinions upon a one time evaluation of [Plaintiff] and perhaps a few medical records, as well as the fact that none of the examining health professionals explained the extent to which [Plaintiff's] ongoing use of alcohol exacerbated his depression and impacted his mental residual functional capacity.

(Tr. 41).

With regard to Plaintiff's alcohol use, the ALJ additionally stated that he found it "most relevant that, at the time of both Dr. Rogers' and Dr. Herlihy's evaluations, . . . [Plaintiff] admitted to

ongoing use of alcohol, a fact which, although recorded in their respective reports, was apparently dismissed by both Dr. Rogers and Dr. Herlihy in their respective assessments of [Plaintiff's] mental functional capacity" (*id.*).   The ALJ further noted, "[a]lthough both Dr. Rogers and Dr. Herlihy diagnosed [Plaintiff] with severe depression, neither of them explained to what extent [his] ongoing use of alcohol, a known depressive substance, exacerbated his depression," and similarly, that "[b]oth Dr. Rogers and Dr. Herlihy opined that [Plaintiff's] mental functioning was markedly impaired due to his depression but they failed to factor in the extent to which [Plaintiff's] depression might be exacerbated by his alcohol use, if any" (Tr. 41–42).

The ALJ was correct in noting that Plaintiff was examined on only one occasion by each of the three examiners (*see* Tr. 41), two of which, Dr. Rogers and Dr. Herlihy, examined Plaintiff in 2002 before Plaintiff sought any mental health treatment.  Thus, the record supports the ALJ's statement, and the ALJ did not err in considering that each of these examiners saw Plaintiff on only one occasion.  *See* 20 C.F.R. § 404.1527.

With regard to the issue of Plaintiff's alcohol use, the record reveals that Plaintiff reported to Dr. Rogers that he drank a "little," and similarly, that he reported to Dr. Herlihy that he drank some, but not much (Tr. 208, 214).  Additionally, as stated by the ALJ, neither Dr. Rogers nor Dr. Herlihy explained how or if Plaintiff's use of alcohol exacerbated his depression (*see* Tr. 206–12; 213–16).  Moreover, although Plaintiff minimized his use of alcohol, lab testing confirmed that he continued to drink despite his hepatitis C and liver condition (*see* Tr. 208, 214, 233).  Thus, the record supports the ALJ statements that Plaintiff continued to drink alcohol, but neither Dr. Rogers nor Dr. Herlihy indicated that they considered this factor in analyzing Plaintiff's depression. Plaintiff contends, however, that if "the ALJ was so concerned about [the impact of Plaintiff's alcohol use on his mental capacities], he should have sought clarification of the physician's [sic] findings, ordered additional testing, or ordered another consultative examination" pursuant to Carril v. Barnhart, 201 F. Supp. 2d 1190 (N.D. Ala. 2002) (Doc. 10 at 18–19).

An ALJ is required to order additional medical tests and examinations only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 404.1517.  Stated another way, an ALJ is not required to order an examination if such an examination is not necessary in order to enable the

ALJ to make a disability determination.  *See* Wilson v. Apfel, 179 F.3d 1276, 1278 (11th Cir. 1999) (holding that additional medical testimony was unnecessary where the record was sufficient for a decision).  In evaluating Plaintiff's contention, this court should consider "whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." Brown v. Shalala, 44 F.3d 931, 935 (11th Cir. 1995) (quotations and citations omitted).  "[T]here must be a showing of prejudice before it is found that the claimant's right to due process has been violated to such a degree that the case must be remanded to the [Commissioner] for further development of the record." Graham v. Apfel, 129 F.3d 1420, 1423 (11th Cir. 1997).

In the instant case, the ALJ relied on the opinion of Dr. Hollingsworth, a mental heath expert, in finding that although Plaintiff had a severe mental impairment, it was not as limiting as he alleged (Tr. 37, 45).  Moreover, the record shows that the issue of Plaintiff's mental functioning was assessed by a variety of mental health experts,[10] so no "evidentiary gaps" existed that would necessitate further development of the record.   Additionally, Plaintiff's reliance on Carril is misplaced.  There, the only mental health provider in the record opined that the plaintiff had a severe mental impairment.  Carril, 201 F. Supp. 2d at 191.  The ALJ rejected the opinion and found that the plaintiff had no severe mental impairment despite the fact that this finding was not supported by the opinion of any mental health expert in the record.  *See id.*  The district court found, therefore, that the record was not fully developed because the ALJ rejected the only evidence in the record that directly addressed the plaintiff's mental impairment.  *Id.* ("rejection of the only medical evidence of a mental health impairment is not substantial evidence to support the [ALJ's] finding that Plaintiff did not suffer a mental impairment").  The present case is clearly distinguishable, and the ALJ did not err in failing to recontact Dr. Rogers and Dr. Herlihy.

With regard to Dr. Herlihy, the ALJ additionally noted that he did only a minimal examination of Plaintiff and relied extensively on the report and testing of Dr. Rogers (Tr. 42).  Similarly, the ALJ noted that although Dr. Herlihy stated that he performed a mental status examination, he did not report any specific findings (*id.*).   He noted only Plaintiff's physical

---

[10]In addition to the opinions at issue in this appeal, the court notes that Plaintiff underwent a consultative examination by a psychiatrist, L. Edward Shehi, Jr., M.D., who opined that Plaintiff's memory was grossly intact, and Plaintiff was "capable of making acceptable work decisions (Tr. 40, 521–22).  Additionally, two agency psychologists opined that Plaintiff's mental impairments do not meet or equal a listed impairment (*see* Tr. 277–94, Tr. 529–45).

appearance, such as "poorly dressed, long hair, little facial expression, and bad teeth" (*id.*; *see also* Tr. 213–14).   Moreover, by Plaintiff's own admission to Dr. Herlihy, it was Plaintiff's physical condition that prevented him from working, not "his emotions" (Tr. 213).   Furthermore, as the ALJ noted, Dr. Herlihy's statement that Plaintiff "cannot hold any gainful employment because of his depression and serious physical problems" (Tr. 214) is not entitled to controlling weight or special significance (Tr. 42).  Indeed, the Commissioner "will not give any special significance to the source of an opinion on issues reserved for the Commissioner."  20 C.F.R. § 404.1527(e)(3); *see also* 20 C.F.R. § 404.1527(e)(1) (a finding of disability or inability to work by a medical source does not mean that the Commissioner will automatically reach the same conclusion); Social Security Ruling 96-5p (whether an individual is disabled is a question reserved to the Commissioner; treating source opinions on such questions are "never entitled to controlling weight or special significance").  The court also notes, that to the extent Dr. Herlihy concluded that Plaintiff was precluded from gainful employment due to his "serious physical problems," this is beyond Dr. Herlihy's area of expertise, as Dr. Herlihy is a psychiatrist.   Similarly, the extent to which Plaintiff's physical problems contributed to Dr. Herlihy's opinion that Plaintiff is "precluded from gainful employment" is unclear.        Lastly, with regard to Dr. Cooper, the ALJ noted that his "conclusions in the Medical Assessment form he completed in conjunction with his September 27, 2004 psychological evaluation report [are entitled to no significant evidentiary weight] because those conclusions are inconsistent with [Dr. Cooper's] findings on mental status examination of [Plaintiff]" (Tr. 42).  In other words, the ALJ afforded little weight to Dr. Cooper's opinions because they were inconsistent with his own examination findings (*see* Tr. 42).  Indeed, Dr. Cooper's notes reflect that Plaintiff was alert and fully oriented, his recent and remote memory were intact, and Plaintiff was able to provide a "coherent history" (Tr. 325).  Moreover, as the ALJ noted, although Dr. Cooper stated that Plaintiff experienced difficulty concentrating during the interview and testing, he also stated that Plaintiff's difficulties were due to pain, not any mental impairment (Tr. 42, 325).[11]   Additionally, the ALJ

---

[11]To the extent Plaintiff's problems with concentration were reportedly due to pain, the ALJ found that Plaintiff's subjective complaints were not credible (*see* Tr. 42, 325–26), a finding that is not at issue in the instant appeal. Nevertheless, the undersigned has considered the record with regard to Plaintiff's subjective complaints because, as will be seen *infra*, the issue of Plaintiff's credibility is relevant to other claims for relief.  Thus, in pertinent part, the court notes that the ALJ correctly found that the objective medical evidence does not support Plaintiff's complaints of disabling pain and fatigue (Tr. 46).  For example, an echocardiogram in May 2000 showed normal left and right

pointed out that as a psychologist, Dr. Cooper was not qualified to address the severity or validity of Plaintiff's pain (Tr. 42).  Finally, the ALJ noted that Dr. Cooper's opinion that Plaintiff had a "poor" ability to function independently was inconsistent with Plaintiff's daily activities (*id.*).  For example, the ALJ noted that on daily activity and background questionnaires, Plaintiff indicated that he can care for his personal needs without assistance, and he can occasionally, cook, wash dishes, and drive an automobile (Tr. 33, 42, 172–73, 427, 429).  Additionally, Plaintiff does the laundry; reads books, newspapers, and the Bible; visits friends and relatives; and leaves the home "daily" (Tr. 33, 428–29).  *See* Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987) (the ALJ may properly consider daily activities when evaluating subjective complaints of disabling pain and other symptoms); *see also* 20 C.F.R. § 404.1529(c)(3)(i).  Although Plaintiff's descriptions of his

---

ventricular function and normal allograft function (Tr. 550).  On September 6, 2000, Vijay K. Caplash, M.D., noted that Plaintiff's heart examination was normal (Tr. 511).  Plaintiff had some tenderness and fullness in his right upper quadrant, but his joints all had normal motion and no swelling (*id.*).  His gait and sensation were normal, and there was no evidence of muscular atrophy (*id.*).  On November 1, 2000, a physical examination was normal (Tr. 195).  On February 5, 2001, Plaintiff had no cardiovascular symptoms, such as shortness of breath with exertion, and his physical examination was normal (Tr. 187).  An echocardiogram revealed that Plaintiff's aortic valve replacement was moving well (Tr. 190).  A physical examination on February 21, 2001, was essentially normal (Tr. 192–93, 557–58).  At an examination on March 27, 2001, Plaintiff had "mild" tenderness in the right hypogastric region on deep inspiration and fine finger tremors on extended arms, but the remainder of his examination was unremarkable (Tr. 200).  Magnetic resonance imaging  of Plaintiff's brain on April 3, 2001, was normal (Tr. 198).  A physical examination in December 2001 was again unremarkable, and an electrocardiogram and EKG were normal (Tr. 567–68).  In April 2002, a physical examination was unremarkable (Tr. 233).  On April 23, 2002, David C. McGiffin, M.D., Plaintiff's heart surgeon, indicated that Plaintiff was "totally asymptomatic" (Tr. 46, 575).  A cardiac examination in June 2002 was "entirely normal" (Tr. 255).  In May 2003, a musculoskeletal examination was unremarkable (Tr. 263).  In October 2004, as noted by the ALJ, a consultative physical examination revealed that Plaintiff's gait, sensation, strength, and range of motion in his extremities were normal (Tr. 35, 332).  Thus, the objective medical evidence is inconsistent with Plaintiff's allegations that had trouble performing physical activity (Tr. 681, 702), a factor properly considered by the ALJ in determining Plaintiff's credibility.  *See* 20 C.F.R. § 404.1529.

Moreover, Plaintiff made statements throughout the record that appeared evasive or less than forthcoming.  For example, Plaintiff testified in 2006 that he had not used drugs in more than sixteen or twenty years (Tr. 689), but the record shows that Plaintiff had a twenty-year history of IV-drug use and was using drugs "almost daily" in October 1998, including abusing Dilaudid and cocaine (Tr. 451).  During an examination, a physician noted that Plaintiff was "not very cooperative," especially regarding history (Tr. 567).  Additionally, the ALJ noted that Plaintiff made widely differing statements concerning the onset and frequency of his "seizures" (Tr. 46–47).  He told some treating sources that he had seizures during heart surgery or had complications that resulted in seizures (Tr. 265, 559).  Plaintiff's surgical records, however, reveal no such complications.  On the contrary, Plaintiff's operation was "uneventful" and his "postoperative convalescence was normal" (Tr. 550).  Thus, although the undersigned has not identified every basis for the ALJ's findings regarding Plaintiff's credibility, the foregoing demonstrates that the ALJ did not err in his consideration of Plaintiff's subjective complaints and in finding Plaintiff less than fully credible.

activities show some limitations (*see* Tr. 33, 428–29), the ALJ is not required to believe all of a claimant's assertions concerning his activities.  *See* Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996).

Based on all of these factors, the ALJ properly afforded lesser weight to the opinions of Dr. Rogers, Dr. Herlihy, and Dr. Cooper.  Moreover, it is worth noting that the medical record in this case is quite lengthy, containing opinions from at least nine treating or examining sources and another four to five from non-examining sources, many of which conflict with one another and all of which the ALJ was required to evaluate.  For example, as previously noted, the ALJ evaluated and then afforded significant weight to the opinion of Kathy A. Hollingsworth, Ph.D., who examined Plaintiff in May 2003 (Tr. 45, 265–66).  Dr. Hollingsworth determined that Plaintiff's immediate memory was only "very mildly" impaired, and his recent and remote memory were intact (Tr. 266).  His attention and concentration were unimpaired for sustained simple attention tasks (*id.*).  Further, Plaintiff showed "average" ability to maintain attention, but below average ability to perform mathematical functions (*id.*).  Dr. Hollingsworth assessed Plaintiff with a GAF score of 55 (Tr. 267).[12]  In addition, Dr. Hollingsworth's opinion was consistent with the opinions of State Agency reviewing psychologists (*see* Tr. 277–94 (DDS psychologist opining in June 2003, after reviewing Plaintiff's records, that Plaintiff's mental impairments do not meet or equal a listed impairment and that Plaintiff has only "at worst, modest" mental limitations); Tr. 529–45 (agency psychologist opining that Plaintiff has no significant mental limitations, or at worst, only moderate limitations, and noting that Plaintiff's depressed mood is reported to be responding to medication)).  Thus, the record contains substantial evidence to support the ALJ's ultimate conclusion, that Plaintiff's mental impairments (i.e., major depressive disorder without psychotic features, and generalized anxiety disorder) — while severe — did not meet or equal a listed impairment.

Although evidence in the record arguably exists to support a decision contrary to that reached by the ALJ, the court is limited in its inquiry and is not empowered to reweigh the evidence.  *See*

---

[12]A score between 51 and 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning  (e.g., few friends, conflicts with peers or co-workers).  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994).

*generally* Martin, 894 F.2d at 1529 (the reviewing court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner); Sewell, 792 F.2d at 1067 (even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence); Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996).   In other words, whether the evidence could have supported an alternative conclusion is not the issue. Thus, Plaintiff is not entitled to relief based on the fact that the ALJ could have reached a different decision, as long as the decision made is supported by substantial evidence and was the result of the application of proper legal standards — as it is here.

C.      Dr. Bader

As Plaintiff's final ground for relief, Plaintiff asserts that the ALJ improperly "rejected the physical limitation opinions of Dr. Bader," a one-time consultative examiner, "on legally insufficient and conclusory grounds" (Doc. 10 at 19–20).

The record reflects that Plaintiff underwent a neurological consultative examination by Daniel Bader, M.D., in January 2006 (Tr. 364–71).  Dr. Bader's report reveals that Plaintiff's physical examination was essentially normal (*see* Tr. 364–66).  For example, Plaintiff had no chest pain or palpitation, no shortness of breath or cough, and no musculoskeletal weakness, pain, or atrophy (Tr. 365).  Additionally, Plaintiff's peripheral vascular system was intact, and his gait and station were normal (*id.*).  Plaintiff's muscle strength and tone were normal, his neurological and psychological functioning was "intact," and his sensation, deep tendon reflexes, and coordination were also intact (Tr. 366).  Examination further revealed that Plaintiff's cranial nerves, "I through XII," demonstrated no abnormalities (*id.*).[13]  Dr. Bader stated that his primary diagnostic impression was "seizure disorder, moderately well controlled with Neurontin" (*id.*).

Following Plaintiff's examination, Dr. Bader filled out a "Medical Source Statement of Ability to do Work-related Activities (Physical)" (Tr. 368–71).  On this form, Dr. Bader indicated that Plaintiff can lift or carry up to fifteen (15) pounds (Tr. 368).  Dr. Bader also stated that Plaintiff's abilities to walk and stand are "affected by [his] impairment," but Dr. Bader did not indicate the extent to which these abilities are affected, as the form requires; moreover, Dr. Bader

---

[13]While not directly relevant to this issue, Dr. Bader also noted that Plaintiff had no anxiety or depression (Tr. 365).

stated that he reached his opinion regarding Plaintiff's walking/standing abilities based on Plaintiff's report (*see* Tr. 368 (noting that Plaintiff "relates this limitation to his heart condition")).  Dr. Bader also found, based on Plaintiff's complaints, that Plaintiff must alternate between sitting and standing (Tr. 369).  Similarly, with regard to postural limitations, Dr. Bader noted that they existed or did not exist based on what Plaintiff "related" to him, and in one instance, Dr. Bader did not provide an opinion because Plaintiff was "not clear" (*see id.*).  Next, Dr. Bader stated that Plaintiff's manipulative abilities are limited as follows: reaching ("occasionally" limited), handling ("minimally" limited), fingering ("occasionally" limited), and feeling ("occasionally" limited — "[Plaintiff] complains his hands go numb and go to sleep") (Tr. 370).  The next section of the form required Dr. Bader to describe Plaintiff's visual and communicative limitations (i.e., seeing, hearing, and speaking) (*id.*).  Dr. Bader indicated that Plaintiff had no such limitations (*id.*).  If Dr. Bader had found that Plaintiff had any visual or communicative limitations, however, the form requires that Dr. Bader describe "how the faculties checked 'limited' are impaired" (*id.*).  Although Dr. Bader did not indicate that Plaintiff had any "limited" visual or communicative impairments, he nevertheless provided a description, as follows: "[Plaintiff] states he stammers.  States he 'can't concentrate.'" (*id.*).  Finally, with regard to environmental limitations, any limitations that were found were based on statements from Plaintiff, such as "[Plaintiff] states he has seizures," which limits the performance of hazardous activities (*see* Tr. 371).

In discounting Dr. Bader's opinions, the ALJ first noted, correctly, that Plaintiff's physical and neurological examinations were normal (*see* Tr. 35).  The ALJ then stated that the limitations on the form filled out by Dr. Bader "were based on [Plaintiff's] subjective reports of what he perceived he was and was not able to do" (*id.*).  Similarly, the ALJ noted that "[i]t does not appear that Dr. Bader made any conclusions regarding [Plaintiff's] physical capacities and limitations based on his objective clinical examination findings (*id.*).

In contending that the ALJ erred in discounting Dr. Bader's opinions, Plaintiff asserts that there was no evidence that Dr. Bader relied solely on Plaintiff's subjective complaints when completing the Medical Source Statement (Doc. 10 at 19–20).  The court cannot agree.  It is evident from a review of the form, as described *supra*, that Dr. Bader's opinions were indeed based upon Plaintiff's reports.  Although, as Plaintiff notes, Dr. Bader reviewed "the various medical records,

which were made available to [him]" in conjunction with his examination of Plaintiff (*see* Tr. 364), Dr. Bader specifically explained on the form that his opinions were based on Plaintiff's reports, not on any medical records.  Moreover, in some respects, the limitations on the form are inconsistent with earlier medical records, further supporting the conclusion that the limitations on the form are based on Plaintiff's reports.  For example, with respect to lifting, Dr. Bader indicated that Plaintiff had four heart surgeries and "can lift/carry up to 15 pounds" (Tr. 368).  Similarly, Dr. Bader noted that "[Plaintiff] relates [his limitation on standing and walking] to his heart condition" (*id.*).  This, however, is inconsistent with the report of Plaintiff's heart surgeon in April 2002, indicating that "from a cardiac standpoint," Plaintiff was "totally asymptomatic," "unlimited in his exercise capacity," and "not limited," although Plaintiff still experienced pain (Tr. 575–76).  Thus, Dr. Bader's opinion, which is based on Plaintiff's subjective complaints, was not entitled to any significant weight.  *See, e.g.*, Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) ("The ALJ was entitled to give less weight to Dr. Harry's opinion, because it was based largely on Kirby's subjective complaints rather than on objective medical evidence.").  This is especially so in the instant case, given that the ALJ found Plaintiff less than fully credible.

Finally, the limitations noted on the form cannot be based on Dr. Bader's own observations of Plaintiff because, as the ALJ noted, Dr. Bader's findings during his examination of Plaintiff were completely normal (Tr. 35, 365–66).  Thus, the opinions on the form are inconsistent with Dr. Bader's entirely normal findings on examination, and good cause exists to discount a physician's opinion when it is inconsistent with his own medical records.  *See* Jones v. Dep't. of Health & Human Serv's, 941 F.2d 1529, 1532–33 (11th Cir. 1991); Edwards, 937 F.2d at 583.

Plaintiff additionally contends that the ALJ had an obligation to recontact Dr. Bader if he had any concern that Dr. Bader's opinion was based on Plaintiff's subjective complaints instead of objective findings (*see* Doc. 10 at 20).  However, for the reasons just discussed, it is obvious that Dr. Bader's opinions were based on Plaintiff's subjective complaints, because Dr. Bader said so, and his objective examination findings were all normal, so there was no need to recontact Dr. Bader. In short, the record was fully developed and remand for further evidence is unwarranted.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560.

Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 24th day of December 2008.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**